***********
Upon review of the competent evidence of record with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employment relationship existed between the parties at all times relevant to these proceedings.
3. Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer at all times relevant to these proceedings and is correctly named; or Defendant-Employer is self-insured.
4. Plaintiff's average weekly wage is $745.93.
5. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Various documents, including:
 1. Pre-Trial Agreement;
 2. Plaintiff's medical records;
 3. Plaintiff's personnel file;
 4. North Carolina Industrial Commission forms and filings;
 5. Discovery responses;
 b. Stipulated Exhibit Two: Additional documents from Plaintiff's personnel file;
 c. Plaintiff's Exhibit One: Correspondence from Plaintiff to Defendant-Employer dated July 23, 2009;
 d. Plaintiff's Exhibit Two: Correspondence from Plaintiff to Defendant-Employer dated August 17, 2009;
 e. Defendants' Exhibit One: Employment description for "Dairy/Frozen Department Manager."
 *********** ISSUES *Page 3 
The issues to be determined are:
1. Whether Plaintiff is entitled to any further workers' compensation benefits?
2. Whether Defendant-Employer provided Plaintiff suitable employment?
3. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 62 years old, with a date of birth of February 28, 1949. Plaintiff began working for Defendant-Employer in January 1999, as a meat cutter. Within approximately three months after being hired as a meat cutter, Plaintiff was promoted to manager of the meat department. During Plaintiff's employment, he worked in stores in different cities in North Carolina, including Smithfield, Rocky Mount, Clinton, and Kinston.
2. As a meat department manager, Plaintiff's duties included sorting and shelving products delivered to his department. The average weight of the product being delivered to him was 60 pounds, but occasionally he would receive products weighing 80 to 90 pounds. Plaintiff was also responsible for ensuring that the shelves remained stocked, which would require him to push and pull items on the shelves. The meat packages could weigh up to five pounds each, and Plaintiff's arms were constantly moving in order to perform his duties. Plaintiff estimated that 80 percent of his shift as a meat department manager would involve moving products because he had to remove out-dated products and keep the display cases full. *Page 4 
3. On March 25, 2006, Plaintiff sustained an injury to his left elbow due to a fall from a ladder at work. Plaintiff received treatment from Dr. Christopher Micheal Barsanti, an orthopaedist, who diagnosed him with a left elbow fracture. On April 5, 2006, Dr. Barsanti performed a surgical repair of the fracture, including implant of a radial head prosthesis.
4. On April 14, 2006, Defendants accepted the compensability of Plaintiff's injury on a Form 60 and began paying workers' compensation benefits. Plaintiff was out of work from March 26, 2006 through May 1, 2006. Dr. Barsanti then released Plaintiff to return to work, but restricted him to no use of his left arm.
5. On May 1, 2006, Plaintiff returned to one-handed work in his pre-injury job as meat department manager. Defendant-Employer accommodated Plaintiff's work restrictions by allowing him to delegate lifting that exceeded his physical restrictions to other employees. At his June 6, 2006 visit Br. Barsanti restricted Plaintiff to one-handed work for eight more weeks.
6. On July 27, 2006, Plaintiff returned to Dr. Barsanti with complaints of numbness and a popping sensation in the elbow area. Dr. Barsanti felt that Plaintiff had "overdone it with his elbow." Dr. Barsanti recommended nerve conduction studies if the symptoms persisted and restricted Plaintiff to lifting 10 pounds with his left arm.
7. Plaintiff continued to receive regular follow-up treatment with Dr. Barsanti and continued to report activity-related pain and numbness in his left wrist and elbow. He was released from care on April 25, 2007.
8. On May 21, 2007, Dr. Barsanti assigned a 10% permanent partial impairment rating to Plaintiff's left arm. On May 22, 2007, Dr. Barsanti responded to a Workers' Compensation Medical Status Questionnaire indicating that Plaintiff had a 10 pound lifting and pushing/pulling restriction of his left arm, that Plaintiff was at maximum medical improvement *Page 5 
and that Plaintiff had a 10% permanent partial impairment to his left arm. Following receipt of Dr. Barsanti's response to the medical questionnaire, Defendants sent Plaintiff documents to sign to receive payment for his permanent partial impairment rating. Plaintiff decided not to sign the documents because he was still having pain and numbness in his left arm. At the time, Plaintiff was still working as meat department manager, a position which exceeded his work restrictions.
9. Due to his physical restrictions and limitations resulting from his compensable injury, Plaintiff was unable to keep up with the demands of the meat department manager position, even with accommodations. The Full Commission finds as fact that the meat department manager position with Defendant-Employer was not suitable employment for Plaintiff, as it required him to perform duties outside of his physical restrictions and limitations.
10. In December 2007, an opening arose for the position of dairy department manager, and Defendant-Employer allowed Plaintiff to transfer to this position. Plaintiff felt the duties in the dairy department would be more suited to his physical capabilities; however, he still needed job accommodations. The dairy department manager position also allowed Plaintiff to have the weekends off, which was not possible in the meat department manager position.
11. The products in the dairy department generally weighed less than those in the meat department, with the heaviest items being the cheese boxes, milk crates and juices. Mr. George Hidy, an assistant manager who had supervisory authority over Plaintiff, agreed that the job description for the dairy department manager required lifting ability of up to 50 pounds until the lifting restrictions changed to 25 pounds in March 2009.
12. Plaintiff's duties as dairy department manager consisted of numerous tasks, including down-stacking pallets, ordering product, managing associates (employees) in his department, removing out-of-date product, stocking shelves, and cleaning. Product was *Page 6 
delivered on pallets. Some pallets would be taken directly to the sales floor for stocking the shelves. The items not stocked would be taken to the back stockroom and brought out as needed. When the shelves in the dairy department needed to be re-stocked, a freight cart would be brought into the stockroom and the needed products would be removed from the shelves, placed on the cart and taken to the proper area of the store for stocking. Plaintiff testified that he spent 80% of his time in the dairy department either moving, arranging or inspecting product. He further testified that the repetitive use of his left arm in the performance of his work duties caused pain in his left elbow. The Full Commission finds Plaintiff's testimony to be credible.
13. The most common products in the dairy department were milk and cheese. Kraft cheese was Defendant-Employer's most popular dairy product. It came in one pound packages, with 36 packages in a case. Plaintiff regularly lifted the 36 pound cases of cheese without assistance when down-stocking pallets and when moving cases of cheese from either the stock room to the sales floor for shelving or back to the stockroom for storage. Milk was delivered on pallets in cases containing four gallons of milk, with each gallon weighing approximately 7.5 pounds. Milk and orange juice were stocked from inside its cooler stock room, which eliminated the need to manually carry cases of milk out to the sales floor; however Plaintiff still lifted the cases during the stocking process. Plaintiff testified and the Full Commission finds as fact that 50% of his job in the dairy department required lifting over 25 pounds.
14. When Plaintiff assumed the position of dairy department manager in December 2007, Defendant-Employer allocated 112 work hours to the dairy department per week, which was sufficient to assist him in accomplishing all of his required job duties. Plaintiff was also allowed to arrange the schedule to ensure that he had adequate help at all times. *Page 7 
15. During the middle of 2008, Defendant-Employer reduced the work hours allocated to the dairy department to approximately 96 hours per week and took away Plaintiff's option to arrange employee schedules to accommodate his needs. Plaintiff testified that these changes made it difficult for him to complete all of his work duties because less help was available when he needed it to assist with the work requirements he could not perform due to his physical restrictions and limitations. At the time, Plaintiff was still working with the 10 pound lifting, pushing and pulling restriction for his left arm.
16. Due to continuing complaints of left elbow pain and numbness, Plaintiff underwent nerve conduction studies of the left arm on August 13, 2007 and on January 19, 2009. Both studies were normal, showing no evidence of cervical radiculopathy, brachial plexopathy, myopathy, or mononeuropathy.
17. On March 27, 2009, Plaintiff acknowledged on a job description for the "Dairy/Frozen Department Manager" that he had the ability to perform the essential functions of this position, "either with or without a reasonable accommodation." This job description indicated that the lifting required was up to 25 pounds. At the time Plaintiff was restricted to lifting no more than 10 pounds with his left arm. At some point in time Defendant-Employer instituted a policy requiring "team-lifting" of items exceeding 25 pounds; however, it does not appear from the evidence that the "team-lifting" policy was regularly followed in the dairy department.
18. On April 22, 2009, Br. Barsanti completed a second Form 25R rating form indicating Plaintiff had a 25% permanent partial impairment rating to his left arm. On May 4, 2009, he completed a second Workers' Compensation Medical Status Questionnaire indicating *Page 8 
that Plaintiff had permanent physical restrictions of no lifting, pushing, or pulling over 25 pounds with the left arm and no climbing. Dr. Barsanti again indicated that Plaintiff was at maximum medical improvement and, contrary to his April 22, 2009 rating, assigned a 35% permanent partial impairment rating to Plaintiff's left arm. During his deposition, Dr. Barsanti clarified that Plaintiff's rating was 35%. Plaintiff testified that he was not aware of these changes in his permanent physical restrictions until his mediation in January 2010.
19. Plaintiff testified that during his last six months of employment, which would have dated back to approximately March 2009, the hours allotted to his department were reduced even more. During the middle of June 2009, Plaintiff began to have discussions with managers about his inability to perform all of the work duties required of him due to his restrictions and the reduction in the amount of assistance provided. At one time when Plaintiff went to Mr. Hidy requesting assistance due to his restrictions and the reduction in his staff, Mr. Hidy testified he told Plaintiff that he could still use his other arm. Mr. Hidy categorized Plaintiff's requests for help as poor planning. He felt Plaintiff did not have a "sense of urgency" and that Plaintiff did not develop a plan and follow through. The record indicates that prior to Mr. Hidy becoming Plaintiff's supervisor beginning in 2009 Plaintiff received favorable annual reviews in 2005, 2006, 2007 and 2008.
20. According to Plaintiff, in his last discussion with "Co-manager Frank" (Francis Carroll Daniels) in July 2009, he was informed that the work hours allocated to the dairy department would be further reduced to approximately 20 hours per week, which when added to his hours, would have been 60 hours per week. Defendant-Employer disagreed with Plaintiff's testimony on the hours allocated, but produced no documentation of the actual hours allocated. Mr. Hidy testified that the bare minimum of hours were, "I would say maybe 60 to 70. It *Page 9 
depends. You know the beginning of the week is a little slower." He could not really say whether there was a time period when the hours in the dairy department consistently dropped to 70 hours.
21. Mr. Daniels testified that he did not know if the hours were ever cut to 20 per week. He felt that 96 hours was probably "the bottom level." Mr. Bruce Arnold Bannister testified that he had no knowledge of the hours being reduced below 96 hours in the dairy department. Mr. Bannister became store manager in the store where Plaintiff worked in May 2009 and had not previously worked at this store. The Full Commission is unable to determine from the evidence whether the assistant hours in the dairy department ever dropped to 20.
22. From April 3, 2004 through September 17, 2009, Plaintiff received eight "coachings" or performance reprimands by Defendant-Employer for various reasons. A "coaching" is held against an employee for one year, so only those "coachings" dating back one year are being considered herein.
23. On October 20, 2008, Plaintiff received a "coaching" for having out-of-date product on the shelves in the dairy department. On January 26, 2009, Plaintiff received a job performance "coaching" for lack of cleanliness in the dairy department and for issues related to products not being in stock and rotation of dates. On July 21, 2009, Plaintiff received a job performance and productivity "coaching" for failure to correctly place product in the appropriate bins, failure to manage his associates, failure to follow up and incorrectly labeling and dating products in bins.
24. In accord with company policy, the July 21, 2009 "coaching" resulted in a "decision-making day" or "D-Day." This action represents a "final warning" in which the employee is sent home for the day with pay and is to return the next day to discuss whether he *Page 10 
wants to continue his employment and if so, how he plans to improve his behavior. According to Plaintiff, he was out on July 22, 2009 for his "D-Day" and returned the following day with a letter written by him explaining that he was having trouble keeping up with his current duties due to his physical restrictions resulting from his March 25, 2006 work injury and that he had previously discussed with Mr. Daniels and Mr. Bannister his concerns about not being able to meet job expectations without assistance. He also mentioned in the letter that they had discussed relieving him of his duties as dairy department manager. The letter was dated July 23, 2009, and was addressed to: "Walmart Management Store 1661."
25. Neither Mr. Daniels nor Mr. Bannister recalled receiving Plaintiff's handwritten letter; however, they recalled that Plaintiff typed a "plan of action" into Defendant-Employer's computer system upon returning from the D-Day. The "Coaching for Improvement" document from Plaintiff's "D-Day" included a section entitled "Action Points/Associate Comments." Plaintiff did not mention having difficulty keeping up with the requirements of his duties as dairy department manager due to his compensable injury or due to a lack of available employee assistance. However, Mr. Hidy and Mr. Daniels were aware that Plaintiff was having difficulty getting all of his job duties accomplished and that Plaintiff was contending that his difficulty was due to his physical restrictions and limitations and the lack of sufficient assistance.
26. On or about July 23, 2009, after Plaintiff's "D-Day" counseling, he informed Co-manager Lisa Howard that he wanted to step down as dairy department manager and transfer to a position with Defendant-Employer that he felt would be more within his permanent work restrictions. In response, Ms. Howard advised Plaintiff to take the day off and return the next day and speak with Mr. Bannister regarding his request to step down as dairy department manager and transfer to a less physically demanding position. Plaintiff complied with this *Page 11 
request, and did not work on July 23, 2009. On July 24, 2009, Plaintiff spoke with Mr. Bannister regarding his request. Mr. Bannister advised Plaintiff that he could not give him an answer right away, and to take another day off while he inquired further regarding Plaintiff's request for a transfer. Plaintiff was subsequently advised that a door greeter job would be opened up for him on third shift.
27. On Monday, August 17, 2009, Plaintiff hand-delivered correspondence written by him to Co-manager Lisa Howard stating the following:
 In regards to my discussion with Co-manager Lisa and Assistant manager George on Friday 08/14/2009 I ask that the job offers that were made be presented to me in the form of a letter. . . . This information is necessary for me to make an informed and intelligent decision regarding my future. I also respectfully request vacation for this week to continue through 08/30/2009, in order that [sic] might have adequate time to assess my option and make arrangements in regards to my obligations that might conflict with my new schedule.
28. On Wednesday, August 19, 2009, Plaintiff accepted Defendant-Employer's written offer of employment as a full-time door greeter. The employment offer was stipulated into evidence and indicated Plaintiff's pay rate would change from $17.43 per hour to $15.73 per hour, and the position start date was September 12, 2009.
29. Defendant-Employer requested that Plaintiff continue in his duties as dairy department manager for the next several weeks to assist in the transition of a new department manager, and Plaintiff agreed to this request. Plaintiff was asked to "help train whoever came over and — mainly that week I was assigned to take care of the resets." Resets involve moving product from one position on the sales floor to another.
30. Plaintiff continued to work in the dairy department until September 5, 2009, when he took a scheduled vacation. Plaintiff testified he did not have any problems performing the *Page 12 
duties assigned to him as acting dairy department manager prior to leaving to go on his scheduled vacation "because basically all I did was do a milk order and do the resets — the case resets." Plaintiff recalled having the assistance of other employees, but "no one specific," other than "one of the young ladies that came over from the Shoe Department — other places that they could get help from the store that had a few hours they wanted to — to put in and make some extra hours came to help out."
31. According to Defendant-Employer's records, on or about September 3, 2009, a marking team came through the store to inspect and audit the store's compliance with internal procedures and requirements. The marking team found numerous out-of-date products still on the shelves in the dairy department. The team discovered 48 gallons of milk with expiration dates of August 31, 2009, which was several days prior to Plaintiff's vacation leave. There is some testimony in the record indicating that the audit happened while Plaintiff was on vacation, but employment records indicate Plaintiff worked, but left early with approval on September 3, 2009 and September 4, 2009. At the time the audit occurred Plaintiff was still working as dairy department manager, or acting manager, since Defendant-Employer had not assigned anyone else to take over his position.
32. When Plaintiff returned to work from vacation, he testified that he worked from September 12, 2009 through September 14, 2009 as a door greeter before Mr. Hidy and Mr. Bannister called him into the office and advised him that he was being terminated for leaving out-of-date product on shelves in the dairy department. Plaintiff responded by asking Mr. Hidy and Mr. Bannister could they terminate him from "a job I had not been assigned to for three weeks." According to Plaintiff, the out-of-date products were left on the shelves during the period when he was doing the resets. *Page 13 
33. Plaintiff was involuntarily terminated from his employment on September 17, 2009. The termination reason was, "Inability to Perform Job." The manager's comments indicated that 48 gallons of milk dated August 31, 2009 had been found on September 3, 2009. The comments further stated, "ED had been demoted as Dept. MGR. in Dairy because of out of dates and poor maintenance of the Dept. but was still working in Dairy until he could be reassigned to another position. He was kept at his MGR. pay rate at that time."
34. Both Mr. Bannister and Mr. Hidy testified that any associate would be coached or terminated for leaving out-of-date product on the shelves because customers can get sick from using out-of-date products, resulting in legal liability. The Full Commission finds that Plaintiff's termination after obtaining four performance reprimands in 12 months was in accord with company policy and other employees would have been terminated under similar circumstances. Defendants have shown by the greater weight of the evidence that Plaintiff was terminated for fault (or misconduct) for which a nondisabled employee would also have been terminated.
35. With respect to whether Plaintiff's termination was related to his compensable injury, Defendants contend that Plaintiff, as manager, could delegate to others the work he felt he could not do as a result of his compensable injury and that as of March 27, 2009, the lifting restrictions under the new job description for dairy manager, which Plaintiff acknowledged he could do, were within the lifting restrictions subsequently assigned to Plaintiff by Dr. Barsanti on May 4, 2009. Defendants further contend that Plaintiff was not terminated as a result of his compensable injury, but as a result of his poor managerial and organizational skills, his failure to follow through on tasks and his failure to appropriately manage his time and his associates.
36. Plaintiff contends that his physical restrictions and limitations from his compensable injury and Defendant-Employer's failure to continue to provide sufficient job *Page 14 
accommodations prevented him from fulfilling all of his job requirements. Plaintiff further contends that the repetitive activities required by his job duties during a substantial portion of each shift aggravated his left arm condition, causing pain and numbness and that the production demands of his job required him to lift in excess his 10 and 25 pound restrictions. Plaintiff also contends that he began to have difficulty in performing all of the requirements of his job after Defendant-Employer reduced the amount of assistance provided to him and also took away his option to schedule employees according to his need for assistance.
37. With respect to whether Plaintiff's compensable injury limited his ability to use his left arm to perform repetitive job activities, the Full Commission finds that Dr. Barsanti never assigned Plaintiff a restriction against repetitive use of the left arm and never addressed repetitive motion in his work notes. At his deposition, he opined that if the repetitive movement of Plaintiff's left arm increased his left elbow pain, then that activity should be avoided. Dr. Barsanti was of the opinion that stocking items of different weights and measurements could be considered repetitive to a degree, but this was a subjective observation. Dr. Barsanti acknowledged that he based his opinions solely upon the subjective statements of Plaintiff, and that the only information he had regarding the duties of the dairy department manager consisted of statements attributed to Plaintiff by Plaintiff's counsel during his deposition.
38. Dr. Richard Sulter Moore, Jr., an orthopedic surgeon, performed an independent medical examination of Plaintiff on November 3, 2009. Plaintiff reported left shoulder pain since his injury, persistent left elbow discomfort and some numbness in the ulnar nerve distribution involving the ring and small finger. Dr. Moore opined that Plaintiff has post-traumatic ulnar neuropathy, which is causally related to his fall from the ladder and the resulting *Page 15 
surgical intervention, and left subacromial bursitis/bicipital tendonitis, which is also causally related to the trauma from the fall.
39. Dr. Moore opined that with the type of injury Plaintiff has, he would restrict him from highly repetitive and production-type activities, as well as unprotected crawling and heights. He opined that any job positions that have components of highly repetitive and production-type activities and unprotected crawling and heights may exacerbate Plaintiff's symptoms related to his left radial head comminuted fracture, his ulnar neuropathy and his subacromial bursitis. Dr. Moore further opined that highly repetitive motion activities should be restricted permanently for Plaintiff to increase the longevity of the arthroplasty and to limit the risk of it loosening. Dr. Moore considered "repetitive" to refer to activities that are done for extended periods of time. He felt that reaching and stocking items over and over for extended periods of time would be repetitive. The Full Commission gives great weight to the opinion testimony of Dr. Moore.
40. Dr Moore also opined, and the Full Commission finds as fact, that Plaintiff will require future medical treatment consisting of follow-up monitoring of the left arm prosthesis, periodic evaluations of his ulnar nerve, therapeutic injections and further imaging as indicated.
41. The Full Commission finds as fact that Plaintiff was required by his job to perform highly repetitive motion activities with his left arm over extended periods of time even though he could delegate tasks to others when they were available. The Full Commission further finds as fact that Plaintiff's physical restrictions and limitations resulting from his injury hampered his ability to perform the repetitive motion activities required by his job as dairy department manager. *Page 16 
42. Based upon the greater weight of the evidence, the Full Commission finds as fact that Plaintiff's inadequate job performance which led to his "coachings" and termination from employment was directly related to his compensable injury. To meet the production requirements of his job as dairy department manager, Plaintiff was required to lift, push and pull weights that exceeded his restrictions and to use his left arm in a highly repetitive manner. As a result of his physical restrictions and limitations due to his compensable injury, Plaintiff could not meet the production demands of his job without sufficient accommodations. The Full Commission finds credible Plaintiff's testimony that he had difficulty performing all of the requirements of his job after Defendant-Employer reduced the amount of assistance provided to him and also took away his option to schedule employees according to his need for assistance.
43. The Full Commission further finds as fact that the job as manager of the dairy department did not constitute suitable employment for Plaintiff. Plaintiff could only meet the job requirements with sufficient accommodations. Although Mr. Bannister testified that Plaintiff could avoid exceeding his lifting restrictions by opening cases of cheese and stocking the packages individually, he further testified he would not allow any other employee, or potential employee applying for a job with Defendant-Employer, to obtain the position if the employee required an accommodation of having to open cases of cheese and stocking the packages individually. Mr. Bannister also agreed that in order to adequately perform the job as dairy department manager the employee would need to be able to use both arms on a repetitive and continuous basis. Based upon information provided by the Dictionary of Occupational Titles, which considers the general duties of a dairy manager across all employers, Ms. Terri Tollefson, Defendants' vocational rehabilitation expert, testified that Plaintiff's job as dairy department manager was not suitable to his restrictions. However, she changed her opinion when provided *Page 17 
information that Plaintiff's new job description stated that the job required lifting of 25 pounds. The Full Commission finds based upon the greater weight of the evidence that Plaintiff in his job as dairy department manager regularly lifted, pushed and pulled in excess of 25 pounds. Mr. Hidy acknowledged that employees in the dairy department lifted and carried product weighing in excess of 25 pounds without assistance and that opening cases and removing one item at a time would take more time to complete the job. Defendant-Employer did not fill Plaintiff's position after his termination, but instead combined the dairy department with the frozen foods department.
44. In October 2009, Plaintiff began receiving unemployment compensation at the rate of $379.00 per week. Plaintiff attempted to locate suitable employment through the Employment Security Commission of North Carolina's Job Link one to two days per week and through his own efforts. He applied for numerous positions at places such as supermarkets, department stores, and the State of North Carolina. He was granted one in-person interview at Sanderson Farms, but when he mentioned his 25 pound lifting restriction, he was told that Sanderson Farms supervisors had to lift. He was not offered a job.
45. Plaintiff had not received any offers of employment as of the date of the hearing before the Deputy Commissioner and he remained out of work. He was attending classes at a community college to enhance his vocational skills, and was continuing to search for suitable employment. The efforts made by Plaintiff to find suitable employment have been reasonable.
46. Defendants retained Ms. Terri Tollefson, a vocational rehabilitation counselor, to perform a labor market survey to determine the availability of suitable employment opportunities for Plaintiff. In identifying jobs that she deemed suitable, Ms. Tollefson considered Plaintiff's lifting, pushing and pulling restrictions. It does not appear from the evidence that she considered *Page 18 
Plaintiff's limitations on repetitive use of his left arm and climbing and crawling. However, it is unclear from the evidence whether these additional physical limitations would have affected the suitability of the jobs she ultimately determined to be within Plaintiff's physical limitations.
47. Although Ms. Tollefson listed nine jobs on her labor market survey, she testified that some of the listed jobs were not suitable. She opined that the following jobs identified were suitable: (a) Sentry Insurance Representative I, although she did not have any wage information; (b) Picture Me, a photography job located in a Walmart store paying $9.00 to $11.00 per hour plus an unknown amount of commission; (c) Hertz, a car rental job paying $8.00 to $9.00 per hour with opportunities for advancement; (d) Copper Beech Townhomes, a leasing manager position, however, no information was provided on actual physical requirements of the job or wages and she only talked to the receptionist. The Full Commission finds the Dixon Marketing position also listed on the labor market survey is not an available position that Plaintiff could obtain because there were no openings, or likely future openings in Plaintiff's geographical area even if Plaintiff could do the job. The Full Commission further finds that the jobs identified at Bojangles and Nebraska Book Store were unsuitable and that the evidence is insufficient to determine whether positions at Copper Beech Townhomes, US Cellular or Convergys would be suitable to Plaintiff's limitations. Therefore, three positions, Sentry Insurance Representative I, Hertz, and Picture Me, from the labor market survey were within Plaintiff's physical restrictions, educational level and qualifications based upon past work experience. For these three jobs the wage information was either unavailable or the wages stated were substantially lower than Plaintiff's pre-injury wages and the job analysis did not factor in Plaintiff's physical limitations related to his repetitive motion restrictions for the left arm. *Page 19 
48. Based upon Plaintiff's bachelor's degree and experience in management, Ms. Tollefson was of the opinion that Plaintiff had the characteristics that would make him attractive to prospective employers and that his physical limitations would not limit his ability to perform jobs. The testimony of Ms. Tollefson is insufficient to prove that suitable jobs are available that Plaintiff can obtain.
49. Plaintiff produced evidence that on the only job interview he was able to get, his lifting restrictions did prevent him from being further considered for the job. Plaintiff further testified that he limited his job search to only the job listings that met his physical restrictions and limitations. Based upon the greater weight of the evidence, Plaintiff has made a reasonable, but unsuccessful, effort to find suitable employment since his termination and his inability to find suitable employment is due, in part, to his compensable injury. Plaintiff has therefore shown that he is entitled to temporary total disability compensation from the date of his termination and continuing.
50. The Full Commission finds, based upon the greater weight of the evidence, Plaintiff is at maximum medical improvement with respect to his March 25, 2006 work injury and has a 35% permanent partial impairment to his left arm.
51. The medical treatment Plaintiff received due to his March 25, 2006 work injury to his left arm was medically necessary in order to effect a cure, to give relief, and/or to lessen his period of disability, and Defendants are obligated to pay for such treatment. Plaintiff needs future medical treatment.
52. Defendants had reasonable grounds to defend this claim, as there were legitimate disputes on a number of issues.
 *********** *Page 20 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On March 26, 2006, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment due to a fall from a ladder, resulting in a left elbow fracture and a surgical repair of the fractures, including implant of a radial head prosthesis. N.C. Gen. Stat. § 97-2(6).
2. As a direct and natural consequence of his compensable injury due to his fall from a ladder and the resulting surgery, Plaintiff has posttraumatic ulnar neuropathy and subacromial bursitis/bicipital tendonitis, which are also compensable.Roper v. J.P. Stevens Co.,65 N.C. App. 69, 308 S.E.2d 485 (1983), Starr v. Paper Co.,8 N.C. App. 604, 175 S.E.2d 342 (1970).
3. As a result of his compensable injury, Defendants paid Plaintiff temporary total disability compensation for the days he missed from work in 2006. N.C. Gen. Stat. § 97-29.
4. Plaintiff's termination from employment did not constitute a constructive refusal of suitable employment. In Seagraves v.Austin Co. of Greensboro, the North Carolina Court of Appeals held that where a plaintiff who sustained a compensable work injury is provided light-duty or rehabilitative employment and is terminated from such employment for misconduct or other fault on the part of the plaintiff, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the plaintiff from receiving workers' compensation benefits. Rather, the test is whether the plaintiff's loss of or diminution in wages is attributable to the wrongful act resulting in loss of employment, in which case benefits will be barred, or whether such loss or diminution in earning capacity is due to a work-related disability, in which case the plaintiff will be entitled to workers' compensation benefits for such disability. *Page 21 Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 233-234, 472 S.E.2d 397, 401 (1996). "Thus, under the Seagraves' test, to bar payment of benefits, an employer must demonstrate initially that: (1) the employee was terminated for misconduct; (2) the same misconduct would have resulted in the termination of a nondisabled employee; and (3) the termination was unrelated to the employee's compensable injury."McRae v. Toastmaster, Inc., *Page 22 358 N.C. 488, 597 S.E.2d 695 (2004).
5. An employer's successful demonstration of such evidence is "deemed to constitute a constructive refusal" by the employee to perform suitable work, which would bar benefits for lost earnings, "unless the employee is then able to show that his or her inability to find or hold other employment . . . at a wage comparable to that earned prior to the injury [] is due to the work-related disability." McRae, 358 N.C. at 494, 597 S.E.2d at 699, quotingSeagraves, 123 N.C. App. at 234, 472 S.E.2d at 401.
6. An employee would be entitled to benefits if he or she can show that work-related injuries, and not the circumstances of his or her termination, prevented the employee from either performing alternate duties or finding comparable employment opportunities.McRae, 358 N.C. at 494, 597 S.E.2d at 699.
7. In applying the Seagraves test herein, Defendants had the initial burden of proof. Defendants have proven the first and second prongs that 1) Plaintiff was terminated for fault or misconduct for accumulating four performance reprimands in a 12 month period for his "inability to perform job" 2) which a nondisabled employee would also have been terminated. The evidence establishes that Defendants have not proven the third Seagraves prong, however, that Plaintiff's termination was unrelated to his compensable injury. McRae v. Toastmaster, Inc.,358 N.C. 488, 597 S.E.2d 695 (2004 Seagraves v. Austin Co. ofGreensboro,123 N.C. App. 228, 233-234, 472 S.E.2d 397, 401 (1996).
8. Since Defendants did not meet their burden of proof underSeagraves' third prong, Plaintiff would not be barred from receiving disability compensation due to constructive refusal of suitable employment and Plaintiff is not required to show that his work-related injuries, and not the circumstances of his termination, prevented him from either performing alternate duties or finding comparable employment opportunities. However, Plaintiff has affirmatively produced evidence showing that his inability to find or hold other employment at a wage comparable to that earned prior to the injury is due to his work-related disability. McRae,358 N.C. at 494, 597 S.E.2d at 699.
9. Plaintiff has also proven that his job as dairy department manager was not suitable under the tests set forth in Peoples v.Cone Mills Corp., 316 N.C. 426, 342 S.E.2d 798 (1986). "If the proffered employment does not accurately reflect the person's ability to compete with others for wages, it cannot be considered evidence of earning capacity. Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level." Peoples 316 N.C. at 438, 342 S.E.2d at 806. Plaintiff has shown that the Defendant-Employer would not hire a prospective employee with his restrictions as dairy department manager and that his restrictions would not be suitable for similar jobs existing in the general labor market according to the Dictionary of Occupational Titles. Plaintiff has also shown that he could not perform the job without sufficient accommodations.
10. Plaintiff has proven that he has been temporarily and totally disabled since the date of his termination on September 17, 2009. An employee can prove that he is disabled in one *Page 23 
of four ways by production of: (1) medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but has after a reasonable effort been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work but that it would be futile because of preexisting conditions, such as age, inexperience, lack of education, to seek other employment; or (4) evidence that he has obtained other employment at a wage less than that earned prior to the injury.Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
11. The greater weight of the evidence establishes that Plaintiff is capable of performing some work, but has after a reasonable effort on his part to find suitable employment, been unsuccessful in his efforts to obtain employment. Russell,108 N.C. App. at 765, 425 S.E.2d at 457. If plaintiff satisfies his burden of proof to establish one of the elements underRussell, the burden shifts to Defendants to "come forward with evidence to show not only that suitable jobs are available, but also that the plaintiff is capable of getting one. . . ." Workman v.Rutherford Elec. Membership Corp.,170 N.C.App. 481, 613 S.E.2d 243 (2005), quoting Burwell v.Winn-Dixie Raleigh,114 N.C.App. 69, 73, 441 S.E.2d 145, 149 (1994). The evidence presented by Defendants is insufficient to meet their burden.
12. Plaintiff is at maximum medical improvement with respect to his March 25, 2006 work injury. Plaintiff has a 35% permanent partial disability rating to his left arm as a result of his compensable injury and is thus entitled to the most favorable remedy for his disability, which is temporary total disability compensation under N.C. Gen. Stat. § 97-29.
13. The medical treatment Plaintiff received due to his March 25, 2006 work injury to his left arm was reasonably and medically necessary in order to effect a cure, to give relief, *Page 24 
and/or to lessen his period of disability. Plaintiff is in substantial need of future medical treatment. Defendants are obligated to pay for such treatment including future medical treatment, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1.
14. Defendants had reasonable grounds to defend this claim, as legitimate factual disputes existed. Therefore, Plaintiff is not entitled to attorney fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $497.31 per week from September 17, 2009 through the present and continuing until further Order of the North Carolina Industrial Commission. Compensation that has accrued shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future by Plaintiff as a result of his March 25, 2006 compensable work injury for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. A reasonable attorney's fee of 25% of the compensation due Plaintiff is approved for Plaintiff's counsel. This attorney's fee shall be deducted from the accrued compensation *Page 25 
owed Plaintiff and paid directly to Plaintiff's counsel and thereafter Plaintiff's counsel shall receive every fourth check.
4. Plaintiff's request for attorney's fees under N.C. Gen. Stat. § 97-88.1 is DENIED.
5. Defendants shall pay the costs of these proceedings.
This the __ day of June 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1